Below is a Memorandum Decision of the Court.

*Mary Jo Heston*
**Mary Jo Heston**
**U.S. Bankruptcy Judge**
(Dated as of Entered on Docket date above)

# UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRICT OF WASHINGTON AT TACOMA

In re:

MICHAEL WILLIAM SINE
SHERRIE KAY SINE,

Debtors.

Case No. 17-44377

**MEMORANDUM DECISION**

This matter came before the Court for an evidentiary hearing on July 20, 2018, on Michael and Sherrie Sine's ("Debtors") objection to Claim No. 5 of Denali Federal Credit Union ("Denali"). After the hearing, the Court requested supplemental briefing from both parties. The Debtors and Denali timely filed supplemental briefs on August 6 and 16, 2018, respectively. Based on the evidence, arguments of counsel, and pleadings submitted, the Court makes the following findings of fact and conclusions of law.

## BACKGROUND

On August 23, 2016, Denali provided a loan to the Debtors in the amount of $49,779.50

MEMORANDUM DECISION - 1

("Loan") for a 36' 1978 Merlin Uniflite Sport Sedan motor vessel ("Boat").[1] The document captioned "Notes Security Agreement and Federal Disclosure Statement" ("Security Agreement") provided Denali with a security interest in the Boat and "any insurance proceeds or any insurance premium refunds."[2] Def. Ex. 1.  Prior to obtaining the loan, the Debtors requested a survey of the Boat by Alaska Maritime Services as a follow-up to a previous survey in March 2014.  The Report of Marine Survey dated August 15, 2016 ("2016 Survey"), which identifies the vessel as a 1978 Merlin, provides that the fair market value of the Boat (as defined in the 2016 Survey) was $78,000, and the replacement cost (as defined in the 2016 Survey) was $225,000.[3]  Def. Ex. 5.  The 2016 Survey indicates that these values were based in part on repairs to the Boat that the Debtors were in the process of completing, including overhauling the port main engine and some auxiliary systems, and thus reflect "both main engines [being] fully operational and all auxiliary systems operational unless otherwise noted within the body of this report."  Def. Ex. 5.

The Debtors filed chapter 13 bankruptcy on November 22, 2017.  In their Schedule A/B, the Debtors listed a 1973 Merlin Sport Sedan, and in Schedule D, they listed the Denali claim as $49,890, with a collateral value of $5,000.  While the Security Agreement and two surveys identified the Boat as a 1978 Merlin, the parties agreed at the July 20, 2018 hearing that consistent with the schedules, the Boat is in fact a 1973 Merlin.

In their original plan filed on December 6, 2017, the Debtors valued the Boat at $5,000 and proposed to pay Denali $100 per month at 6% interest, plus all available funds after attorney fees and administrative expenses. The Debtors are above-median debtors, and their plan lists

---

[1] Based on the testimony of Michael Sine ("Debtor"), the Debtor appears to have purchased the Boat in 2014.  This is consistent with the General Index or Abstract of Title attached to Denali's proof of claim and the Report of Marine Survey dated March 10, 2014.
[2] The Security Agreement also specifies that Alaska law applies to all parts of the agreement.
[3] The Report of Marine Survey dated March 10, 2014, which also identifies a 1978 Merlin, provided an estimated fair market value for the Boat of $78,000 and replacement cost of $225,000.  Def. Ex. 6.

MEMORANDUM DECISION - 2

a liquidation value of $0 and no proposed distribution to general unsecured creditors. On December 21, 2017, Denali filed a proof of claim ("Claim") in the amount of $49,685.50, with a secured claim of $23,150 and an unsecured claim of $26,535.50.

Postpetition and preconfirmation sometime in December of 2017, the Boat partially sank in Valdez, Alaska. The Boatowners Policy between the Debtors and their insurance carrier provides that the insurance carrier will pay the smaller of the cost of repair or replacement. Pls. Ex. 1 at 6. The Debtors submitted to their insurance carrier a claim along with a repair estimate by Boat Works, dated December 13, 2017, for repairs to the Boat in the total amount of $29,605.59, which includes labor of over $18,620[4] ("Estimate"). Def. Ex. 7. The insurance carrier subsequently issued a check in the amount of $23,998 made payable jointly to the Debtors and Denali. According to the Debtor's testimony, the insurance carrier will pay an additional $5,000 or so after the repairs to the Boat included in the Estimate are completed.[5]

The Debtors filed amended plans on February 8 and 13, 2018, proposing to surrender the Boat. The Debtors, however, have indicated that they now wish to keep and repair the Boat using the insurance proceeds, which will be reflected in another amended plan to be filed. On May 4, 2018, the Debtors filed an objection to Denali's Claim, seeking an order allowing the Claim as a secured claim in the amount of $5,000 and an unsecured claim for the balance. On May 29, 2018, Denali filed a response, arguing that the insurance proceeds ("Proceeds") of $23,998 alone support Denali's secured claim of $23,150. The Court scheduled an evidentiary hearing for July 20, 2018, to determine the value of the Boat, and the parties submitted pre-hearing briefs.

---

[4] This includes in-house labor of $12,120 and outsourced labor of $6,500.

[5] While there is no specific amount in the record, based on the repair Estimate of $29,605.59 and the issued check of $23,998.00, it appears the Debtors likely will receive an additional $5,607.59 after all repairs are completed.

MEMORANDUM DECISION - 3

The Debtors' sole witness at the hearing was one of the Debtors, Michael Sine ("Debtor"). The Debtor testified as to his many years of experience working with boats while living in Alaska and Washington, including building boats for LaConnor Maritime and a Navy contractor. He testified that he has been buying and selling boats for some 40 years, including a 23.5' Uniflite and 28' Uniflite. The Debtor identified his affection for Uniflite boats, and he detailed how he came to purchase the Boat in Alaska. The Debtor was not offered as an expert in valuing boats but instead testified as a lay witness.

The Debtor testified that when he examined the Boat for purchase, the Boat was in good condition. The port engine had a slight knock or tick, but the starboard engine was running and seemed strong, quiet and smooth. After the Debtor purchased the Boat, he discovered several problems. In order to make repairs, the Debtor enclosed the engines in a structure on the back of the Boat and took apart the port engine. When the 2016 Survey was prepared in August 2016, the port engine was not operational. Even so, the Debtor agreed that the Boat overall was in average condition at that time. While he believed the $78,000 fair market value established by the 2016 Survey was high, he was not insulted by this value.

At the time of the bankruptcy filing in November 2017, the port engine repairs were finished except for a few components, and it was being held in a repair shop to prevent rusting. According to the Debtor, once completed, the port engine's condition would have been "excellent." The Debtor further testified that the starboard engine was in good or at least average condition at the time of the bankruptcy filing. The Debtor testified in detail as to several repairs or upgrades the Boat still needed, including fixing or replacing leaky windows, moldy carpet, and deteriorated batteries. The Debtor testified that he had intended to bring the Boat back to new condition prior to its sinking, and he believed it would have been worth at least $100,000 if refurbished as he desired.

The Debtor acknowledged that while it has been almost two years since he had seen the Boat, there have been no additional repairs on the Boat since then. Additionally, he has not inspected the Boat since it partially sank. It was the Debtor's testimony that the Boat's condition would have only deteriorated between the time he last saw the Boat and the bankruptcy filing as it was just sitting out in the elements.

The Debtor arrived at a value of $5,000 for the Boat by relying on his own experience and knowledge and looking at boats in comparable condition on Craigslist. The Debtors submitted into evidence five comparables pulled by the Debtor from Craigslist in the first half of 2018, which he believes are private party sales. Pls. Exs. 3-7. The Debtor testified that he has purchased or sold between five and ten boats from Craigslist, and testified that in his experience, there typically is a 10 to 50 percent discount from the advertised price in the final purchase price. The Debtor noted that the comparables were sold in Washington, not Valdez, Alaska, which he opined is a very small market and not consistent with the Washington market. The Debtor's five comparables ranged in price from $995 to $10,900.

Cheryl Rice, the Credit Administration Director for Denali, testified that the Debtors owed $49,685.50 on the Loan when they filed bankruptcy. Ms. Rice obtained the N.A.D.A. value for a 1978 Merlin[6] at the time of the bankruptcy filing, which lists a high retail value of $23,150 and average retail value of $19,315. The used trade-in value is $15,350.

Terry James Larson ("Mr. Larson") testified as an expert in boat valuation. Mr. Larson is a member of the Society of Accredited Marine Surveyors and has been a marine surveyor since November 2004. Prior to becoming an accredited marine surveyor, Mr. Larson was the parks and recreational director for a small city for 30 years. Mr. Larson testified that he primarily surveys recreational boats, sail and powerboats of varying length, but also some commercial

---

[6] As noted previously, the Boat is a 1973 Merlin, not 1978.

MEMORANDUM DECISION - 5

boats. To value a boat, he relies heavily on actual data contained in Soldboats.com, to which he subscribes. This website reports retail boat sales: boat manufacturer, length, model, year, list price, sale price, and location. There is no tracking record for private sales contained in this service. Mr. Larson typically takes a years' spread, of maybe six years, and focuses on a particular region. He also uses other resources like N.A.D.A., Yacht World, and word of mouth. Mr. Larson has performed hundreds of surveys since 2004, primarily in the Puget Sound area.

Regarding the Boat, Mr. Larson testified that the first step he took was to contact a surveyor located in Juno to report on the Alaska market. Based on information obtained from this surveyor, Mr. Larson opined that values in Alaska are higher than in Washington by approximately 12 to 15 percent. Mr. Larson then looked at Soldboats.com and came up with about ten comparables based on factors including cost, running condition, and pictures. Mr. Larson used the range from 1973 to 1977, since these production years made the exact same model. He testified that as to differences between a 1973 and 1977 Merlin, when a boat is that old, it comes down to the boat's condition.

Mr. Larson also relied on the 2016 Survey, and he obtained information from the surveyor who performed the 2016 Survey via telephone and photographs. Mr. Larson learned that prior to the partial submersion, the port engine was out of the Boat for major repair, but the starboard engine was operational. Additionally, the rest of the boat was in good condition in 2016. For purposes of his valuation, Mr. Larson assumed the starboard engine was operational, but he did not rely on reinstallation of the port engine, assuming instead it was no longer in the boat and was unserviceable. Based on his review, and considering the Alaska market, Mr. Larson valued the Boat at between $11,000 and $15,000 at the time of the bankruptcy filing. He provided a $4,000 spread because he did not see the Boat in person, acknowledging that he does not normally conduct a formal survey without seeing the boat in person. Mr. Larson further testified that the Boat is now worth between $8,000 and $12,000 after the partial sinking, based

on Alaska values. He explained that the value did not decrease much because there is a large market of buyers in the area seeking to purchase and repair boats for resale. People with this expertise do not need to pay for labor, which otherwise would be very expensive. Mr. Larson has surveyed at least 20 Uniflites over the last 14 years, and he owned a 32' Uniflite for nine years.[7]

The Debtor disagreed with Mr. Larson's valuation. He reiterated that the Valdez market is lower, while acknowledging that he has only purchased one boat and sold zero boats in Valdez. The Debtor also testified that there were additional problems with the Boat not visible to Mr. Larson, and the GPS on the Boat was not new as relied on by Mr. Larson in reaching his value.

At the close of the hearing, the Court requested additional briefing on how the Court should treat the insurance payments for purposes of valuing Denali's claim, under 11 U.S.C. §§ 506(a) and 552(b).[8]

**ANALYSIS**

In order to determine the value of the Boat for purposes of § 1325(a)(5)(B)(ii), the Court must address the following: (1) are the insurance payments proceeds of the Boat; (2) if yes, are the payments recoverable by Denali in addition to the Boat; and (3) if yes, to what extent can they be recovered?

A. <u>The insurance payments are proceeds of the Boat</u>.

---

[7] During direct examination of Mr. Larson, the Debtors objected on relevance grounds to Denali's request for Mr. Larson's opinion of the Boat value if the repairs in the Estimate were completed. The Court sustained the objection, but permitted Denali to make an offer of proof.

[8] Unless otherwise indicated, all chapter, section and rule references are to the Federal Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

MEMORANDUM DECISION - 7

State law determines the nature and extent of security interests. Arnot v. Endresen (In re Endresen), 548 B.R. 258, 269 (9th Cir. BAP 2016) (citing Philip Morris Capital Corp. v. Bering Trader, Inc. (In re Bering Trader, Inc.), 944 F.2d 500, 502 (9th Cir. 1991)). The Security Agreement explicitly provides Denali a security interest in the Boat and "any insurance proceeds." Under applicable Alaska law, which has adopted Revised Article 9 of the Uniform Commercial Code ("UCC"), "[t]he attachment of a security interest in collateral gives the secured party the rights to proceeds provided by AS 45.29.315." Alaska Stat. § 45.29.203(f). The parties do not dispute that Denali has a security interest in the Proceeds. See Alaska Stat. § 45.29.315(a)(2) ("a security interest attaches to any identifiable proceeds of collateral"). Nor do they dispute that under Alaska law, Denali's security interest in the Proceeds is perfected to the extent its security interest in the Boat is perfected. See Alaska Stat. § 45.29.315(c) ("[a] security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected").[9]

The question, then, is what are the "proceeds" in this case? Property rights are created and defined by state law. Butner v. United States, 440 U.S. 48, 55, 99 S. Ct. 914, 918 (1979). Alaska Stat. § 45.29.102(a)(80)(E) defines "proceeds" to mean the following property: "to the extent of the value of the collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to the collateral." Thus, insurance payments are proceeds only "to the extent of the value of the collateral" and only when they arise from damage to the collateral. Steven Walt, When Are Insurance Payments Recoverable Proceeds Under Revised Article 9?, 38 No. 2 UCC L. J. Art. 4, Fall 2005, at 3. Here, the insurance payment arose from damage to the Boat. The amount of the insurance payment that constitutes proceeds, however, is limited to the value of

---

[9] The General Index or Abstract of Title attached to Denali's proof of claim indicates that a Preferred Mortgage was filed with the Department of Homeland Security U.S. Coast Guard on August 24, 2016.

MEMORANDUM DECISION - 8

the collateral, as set forth in Alaska Stat. § 45.29.102(a)(80)(E). The Court's determination of the Boat's value follows.

1. *Value of the Boat*

Cramdown of a secured claim under § 1325(a)(5)(B)(ii) allows the debtor to bifurcate the claim into its secured and unsecured portions in accordance with § 506(a), limiting the creditor's allowed secured claim to the present value of the collateral instead of the entire contract debt. 4 Collier on Bankruptcy ¶ 506.03[4][a][iv] (16th ed. 2018). Under § 506(a)(2), the value of personal property of an individual debtor in a case under chapter 7 or 13 "shall be determined based on the replacement value of such property as of the date of the filing of the petition." If the property was acquired for personal, family, or household purposes, § 506(a)(2) further defines "replacement value" to mean "the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined." The debtor bears the burden of proof on the issue of valuation under § 506(a). In re Finnegan, 358 B.R. 644, 649 (Bankr. M.D. Penn. 2006). The parties agree that the pertinent date for valuation of the Boat is the petition date.

In the Ninth Circuit, bankruptcy courts generally determine value under § 506(a)(2) on a case-by-case basis. See Taffi v. United States (In re Taffi), 96 F.3d 1190, 1193 (9th Cir. 1996). Retail value under § 506(a)(2) is calculated by adjusting the retail values in Kelley Blue Book, N.A.D.A. Guide, or other reliable market reports readily available to the public, by a reasonable amount based on evidence regarding the property's condition and other relevant factors. In re Morales, 387 B.R. 36, 42 (Bankr. C.D. Cal. 2008); Finnegan, 358 B.R. at 649. "The burden in proving the reasonableness of any deviation from the guide retail value rests with the debtor because the debtor has the best access to information about the condition of the vehicle." Morales, 387 B.R. at 45.

MEMORANDUM DECISION - 9

The Debtor testified at the evidentiary hearing that the value of the Boat on the petition date was $5,000. The Debtors placed this same value on the Boat in their bankruptcy schedules. The Debtor based his opinion on his experience with boats generally, his personal knowledge of the Boat and its condition, and the review of comparable boats for sale by private sellers through Craigslist.

In contrast, Denali's expert witness in valuation, Mr. Larson, testified as to the Boat's value on the petition date. Larson has been a marine surveyor since 2004 and has performed hundreds of marine vessel surveys in that time. According to Mr. Larson, the value of the Boat on the petition date and prior to it sinking was in the range of $11,000 to $15,000.[10]

After considering the evidence and testimony presented, the Court determines that the best evidence of value of the Boat in consideration of the factors set forth in § 506(a)(2) is $15,000. Although the Debtor clearly has experience with boats and various aspects of the marine industry, the Court places little weight on the five comparables he relied on. All of the Debtor's comparables are for boats located in Washington State, as opposed to Alaska where the Boat is located, and have not been adjusted for the different markets. Furthermore, the Debtor relied on private party sales rather than sales by retail merchants and are therefore not appropriate evidence of retail value for purposes of § 506(a)(2).

Each of the comparables are also for boats that can be distinguished from the Boat at issue. For instance, the comparable marked as Debtors' Exhibit 3 is for a smaller, older boat and is still valued higher than the Debtors' Boat, at $7,000. The vessel marked as Debtors' Exhibit 4 is valued at $4,000, but did not have any working motors in the boat and, unlike the Debtor's Boat, was for sale without the drives. The comparable at Debtors' Exhibit 5, is also for an older, smaller boat, with one working motor. The sales price of $6,800 is still higher than the

---

[10] Denali relied on N.A.D.A. high retail value in filing its proof of claim. However, Denali relied on the high retail value for a 1978 Merlin, not a 1973 Merlin. Evidence of the N.A.D.A. retail value of a 1973 Merlin has not been provided so the Court did not rely on any retail value guides in valuing the Boat.

MEMORANDUM DECISION - 10

Debtor's value, and the seller represents that the value will have to be adjusted higher when both motors are running. Debtor's Exhibit 6 is also for a smaller, but newer boat. Both engines are represented as running, but the value at $10,900 is more than double the Debtor's value for the Boat. The last comparable is only listed for sale at $995, but it is for a smaller boat with no engines.

The Court also finds the Debtor's opinion of value to be not credible in light of the 2014 and 2016 Surveys. In both surveys, completed approximately two and half years apart, the Boat was given a fair market value of $78,000 and replacement cost of $225,000. The Debtor failed to provide any explanation as to why the Boat would have decreased so dramatically from a fair market value of $78,000 to $5,000 in the 16 months that passed between the date of the most recent survey and the bankruptcy filing. While the Debtor testified that he discovered several problems with the Boat soon after purchasing it, he agreed that as of the 2016 Survey, the Boat was in average condition. Additionally, the $78,000 value in the 2016 Survey took into account an "overhaul of the port engine and some auxiliary systems" by the Debtor. It appears that much of this work was completed as of the bankruptcy filing, as the Debtor testified that the port engine repairs were basically finished except for a few components. The Debtor has failed to present credible evidence supporting a $5,000 replacement value.

Although Mr. Larson did not inspect the Boat in person, he testified that he reviewed photos of the Boat and had several conversations with the surveyor that performed the 2014 and 2016 surveys. Based on his experience and methods that he used to come up with his opinion of value, the Court does not find that Mr. Larson's lack of a first-hand examination of the Boat affects his credibility or the weight that should be afforded his expert testimony.

Mr. Larson indicated a value range for the Boat as of the petition date between $11,000 and $15,000. The Court concludes that the value of the Boat for purposes of determining Denali's secured claim is the high end of this range, or $15,000. In making this determination,

MEMORANDUM DECISION - 11

the Court took into consideration Mr. Larson's testimony that values are approximately 12 to 15 percent higher in Alaska than other areas in the Pacific Northwest. Mr. Larson also indicated that his value did not include the value of the port engine that was not installed on the Boat on the petition date. Although the Debtor testified that the port engine was not fully repaired as of the petition date, he stated that it had new exhaust manifolds, components, alternators, and a new heat exchanger, and only lacked cylinder heads. Once complete, the Debtor testified that it "would have been excellent." Taking into consideration all of these factors, including the fact that the Boat was given a fair market value of $78,000 only 16 months prior and that several of the cited repairs in that report had been made to the Boat since the 2016 Survey, the Court values the Boat at $15,000 for purposes of § 506(a).

        2.    *Amount of insurance payment that qualifies as "proceeds"*

Under Alaska Stat. § 45.29.102(a)(80)(E), insurance payments are "proceeds" only "to the extent of the value of the collateral." Accordingly, the proceeds in this case are limited by state law to the value of the Boat at the time of the petition, or $15,000.

    B.    <u>Denali's secured claim payable through a chapter 13 plan is limited to the secured value of the Boat.</u>

Denali contends that it is entitled to payment of the Proceeds, in addition to the value of the Boat to be paid as a secured claim through the Debtors' chapter 13 plan.[11] At the hearing and in briefing, Denali appeared to argue that the proceeds never became part of the Debtors' estate because the Security Agreement specifically stated that the loan was "also secured by any insurance proceeds or any insurance premium refunds." Property of a chapter 13 estate,

---

[11] The Court is aware that under the Revised Article 9, there appears to be no binding authority preventing Denali generally from recovering both the value of the collateral and the Proceeds as defined by Alaska Stat. § 45.29.102(a)(80)(E), up to the amount of the outstanding debt. See Steven Walt, <u>When are Insurance Payments Recoverable Proceeds Under Revised Article 9?</u>, 38 No. 2 UCC L. J. Art. 4, Fall 2005. As recognized by the bankruptcy court for the Northern District of New York in <u>Holtslander</u>, however, "[t]he outcome of this matter does not depend primarily on state law . . . but rather on issues that must be determined in the context of both state and federal law with a particular emphasis on the Bankruptcy Code provisions affecting [the creditor's] state law rights." <u>In re Holtslander</u>, 507 B.R. 779, 783 (Bankr. N.D. N.Y. 2014) (citations omitted).

MEMORANDUM DECISION - 12

in addition to the property specified in § 541, includes "all property of the kind specified in such section that the debtor acquires after the commencement of the case." § 1306(a)(1). Under § 541(a)(6), estate property includes "[p]roceeds, product, offspring, rents, or profits of or from property of the estate." Courts have generally held that insurance policies themselves and the debtor's rights under such policies are property of the debtor's estate. MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 92 (2nd Cir. 1988). Although courts have recognized exceptions to this general rule, depending on the nature of the insurance, the timing of the loss, and the terms of the policy, none of these exceptions are applicable to this case. See, e.g., In re Motto, 263 B.R. 187 (Bankr. N.D. N.Y. 2001) (involving credit life and disability proceeds, as opposed to casualty; credit disability proceeds are generally held to be property of the creditor).

Here, the Boat was property of the estate when the Debtors filed their petition. The conversion of the property from collateral to proceeds postpetition did not alter the character of the proceeds as property of the estate under § 1306(a)(1). Holtslander, 507 B.R. at 784-85. The parties were co-insured on the insurance policy, and the insurance carrier issued a joint check to the Debtors and Denali postpetition. There is nothing in the record to support the argument that Denali, as opposed to the Debtors, has sole rights to the insurance proceeds. See Bradt v. Woodlawn Auto Workers, F.C.U. (In re Bradt), 757 F.2d 512, 515 (2nd. Cir. 1985) (automobile insurance check payable jointly to chapter 13 debtor and loss payee creditor is unquestionably property of the estate). Thus, the Proceeds also became property of the Debtors' estate.

The issue now is whether the Debtors' plan must provide Denali a secured claim for the value of the Boat and the amount of the Proceeds. While there is a dearth of caselaw on this issue for postpetition, preconfirmation losses, several courts have addressed the issue of various parties' interests in insurance proceeds resulting from damage or loss to collateral

MEMORANDUM DECISION - 13

postconfirmation. The majority opinion is that such proceeds from the postconfirmation destruction of collateral are property of the estate and the secured creditor's interest in the proceeds is limited to the value of its allowed secured claim as set forth in the debtor's confirmed plan. See, e.g. Holtslander, 507 B.R. at 786; In re Gibson, 218 B.R. 900, 904 (Bankr. E.D. Ark. 1997). The primary rationale of these cases is that the determination of the amount of the secured claim in the confirmed plan is res judicata as to value as of the petition date.

The Court recognizes that this case is distinguishable from the cases with postconfirmation losses, as there is no res judicata effect of a confirmed plan here. Yet for purposes of valuation under § 1325(a)(5)(B)(ii), this Court also is bound by a critical date—the petition date. The parties have not argued for or provided any authority to support a valuation date other than the petition date. Such a date is consistent with the first sentence of § 506(a)(2), as well as with this Court's decision generally in In re Montiel, where the Court noted,

> "[f]or purposes of confirming a plan, the petition date is the critical and logical date for determining the status of claims and generally establishing the respective rights of debtor and creditors, to the extent possible. . . . The petition date is also the point for determining other critical confirmation issues, including the value of property to be distributed in the plan on account of claims."

In re Montiel, 572 B.R. 758, 762 (Bankr. W.D. Wash. 2017) (see cases and rationale cited therein supporting use of the petition date).

This case also differs from those that have relied on insurance proceeds to determine the value of the damaged collateral. See, e.g. In re Woods, 97 B.R. 850 (Bankr. W.D. Va. 1989); In re Carey, 202 B.R. 796 (Bankr. M.D. Ga. 1996). Although the collateral in each of these cases was damaged postpetition, preconfirmation, unlike the case before this Court, the collateral was totaled and the issue was whether the debtor could use the insurance proceeds to purchase a replacement vehicle. The bankruptcy courts allowed the debtors to use such proceeds to purchase replacement vehicles and placed liens on the replacement vehicles in favor of the creditors as adequate protection. Woods, 97 B.R. at 852; Carey, 202 B.R. at 800.

MEMORANDUM DECISION - 14

Valuation for purposes of replacement, however, is not at issue in the case currently before the Court. In fact, the Boatowners Policy specifically provides that the carrier will pay the *smaller* of the cost of repair or replacement. Pls. Ex. 1 at 6 (emphasis added). It is undisputed that the Proceeds were issued for the specific purpose of repairing the Boat, not replacing it.

A distinguishing factor of bankruptcy, as opposed to nonbankruptcy law, is the importance of value to the determination of a secured claim. "Under *non*bankruptcy law, a claim is typically considered to be a secured claim if it is secured by collateral of some sort, regardless of value of the collateral." 4 <u>Collier on Bankruptcy</u> ¶ 506.03[4][a][i] (16th ed. 2018) (emphasis added). Under chapter 13 bankruptcy law, however, a benefit is the ability to modify the rights of secured creditors and "cramdown" the value to be distributed under the plan to the allowed amount of such claim. <u>See</u> § 1322(b)(2) and § 1325(a)(5)(B)(ii). Pursuant to § 506(a)(2), value is determined as of the petition date. In this case, the Boat is valued at $15,000 as of the petition date, and there were no insurance proceeds in existence at that time. Accordingly, pursuant to § 1325(a)(5)(B)(ii), the Debtors' plan must provide for the secured claim of the Boat in this amount.

### C. <u>Denali is entitled to adequate protection in the Proceeds.</u>

The Debtors acknowledge that the Proceeds are Denali's cash collateral and a consumer debtor may only use property of the estate if adequate protection is provided. § 363(a) and (e). Brief in Support of Obj. to Claim 3:16-17, ECF No. 66. The Debtors argue that Denali will be adequately protected by retaining its lien on the Boat until its allowed secured claim of $15,000 is paid in full. The Debtors further argue that the equities of the case do not support Denali retaining a security interest in the Proceeds under § 552(b). The Court disagrees with both contentions.

Under the Code, the general rule is that property acquired postpetition by the debtor or estate is not subject to any lien arising from a prepetition security interest. <u>Endresen</u>, 548 B.R.

MEMORANDUM DECISION - 15

at 268.  Section 552(b)(1), however, provides that prepetition security interests that apply to proceeds of collateral also apply to proceeds of such collateral acquired after the bankruptcy petition.[12]  Nonetheless, this exception to the general rule is also subject to the exception that the court may order otherwise based on the "equities of the case."  While the Code does not define this phrase, the Ninth Circuit Bankruptcy Appellate Panel ("BAP") has examined the purpose of the equities exception contained in § 552(b)(1):

> Although "equities of the case" is not defined in the Code, at least five courts of appeal have assigned a nearly identical meaning to this provision. See Stanziale v. Finova Capital Corp. (In re Tower Air, Inc.), 397 F.3d 191, 205 (3d Cir.2005); N.H. Bus. Dev. Corp. v. Cross Baking Co., (In re Cross Baking Co.), 818 F.2d 1027, 1033 (1st Cir.1987); United Va. Bank v. Slab Fork Coal Co., 784 F.2d 1188, 1191 (4th Cir.1986); In re J. Catton Farms, Inc., 779 F.2d at 1246–47; Wolters Vill. Ltd. v. Vill. Props., Ltd. (In re Vill. Props., Ltd.), 723 F.2d 441, 444 (5th Cir.1984). Essentially, these courts have held that the principal purpose of the equities of the case exception is to prevent secured creditors from reaping unjust benefits from an increase in the value of collateral during a bankruptcy case resulting from the (usually) reorganizing chapter 11 debtor's use of other assets of the estate or from the investment of non-estate assets. See Toso v. Bank of Stockton (In re Toso), 2007 WL 7540985, at *13 (9th Cir. BAP Jan. 10, 2007) (citing the above cases and determining that "[n]o circuit case law attributes a different meaning to this phrase."); All Points Capital Corp. v. Laurel Hill Paper Co. (In re Laurel Hill Paper Co.), 393 B.R. 89, 93 (Bankr.M.D.N.C.2008) ("The cases involving section 552(b)(1) appear to place the most weight on whether a debtor expended unencumbered funds of the estate, at the expense of the unsecured creditors, to enhance the value of the collateral.").

Endresen, 548 B.R. at 274.

As the BAP recognized, § 552(b)(1) is normally relevant in chapter 11 "'to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result

---

[12] Section 552(b)(1) provides in relevant part as follows:
> [I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds . . . of such property, then such security interest extends to such proceeds . . . acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

MEMORANDUM DECISION - 16

of the trustee's/debtor-in-possession's use of other assets of the estate.'" Tower Air, 397 F.3d at 205 (quoting In re Bennett Funding Group, Inc., 255 B.R. 616, 634 (N.D.N.Y. 2000)). Here, the chapter 13 Debtors do not propose to use other, unencumbered assets of the estate, but instead Denali's cash collateral. They also do not propose to use the funds to the detriment of the unsecured creditors and to the benefit of Denali. Based on the Boatowners Policy, the insurance proceeds paid by the insurance carrier are to repair the Boat, not increase the Boat's value. Additionally, because the Boat is valued as of the petition date, any possible increase in its value through repairs made using the Proceeds will not inure to the benefit the Denali, but to the Debtors. The exception contained in § 552(b)(1) is not applicable here.

The Debtors have represented to the Court that they will file an amended plan proposing to retain and repair the Boat. The Debtors have further represented that they will use the insurance proceeds to make such repairs. Despite such representations, the Court disagrees that the filing of an amended plan that provides for retention of Denali's lien and payment of the Boat value through the plan is sufficient adequate protection. While the Proceeds were paid by the insurance carrier to cover the "full cost of repairs," there is no guarantee that the Debtors will use the funds for their intended purpose. It could be a detriment to Denali if the Debtors use the funds for any other purpose and fail to complete the plan. See § 1325(a)(5)(B)(i)(II). In closing arguments at the evidentiary hearing, Debtors' counsel indicated that the Debtors would agree to hold such funds in his trust account and provide periodic documentation to both Denali and the chapter 13 Trustee as to the status of repairs being completed and any funds disbursed for such repairs. In order to provide Denali adequate protection, the Court will require that such safeguards be implemented. Furthermore, pursuant to § 552(b)(1), Denali will retain a security interest in the Proceeds until Denali has verified that the funds have been fully and properly utilized to repair the Boat in accordance with the Estimate, and the Debtors have completed a confirmed chapter 13 plan in this case.

MEMORANDUM DECISION - 17

Accordingly, the Court concludes that the Debtors' objection to claim is sustained in part. For purposes of 11 U.S.C. § 1325(a)(5)(B)(ii), Denali is allowed a secured claim in the amount of $15,000, and a general unsecured claim for the balance of Denali's claim.

/ / / End of Memorandum Decision / / /